**NORTHBRIDGE ELECTRONICS, INC.**

v.

**The UNITED STATES.**
No. 42–64.

United States Court of Claims.
July 14, 1971.

Nichols, J., concurred and filed opinion.

Gilbert A. Cuneo, Washington, D. C., attorney of record, for plaintiff. Buel White, Sellers, Conner & Cuneo, Washington, D. C., of counsel.

Christine O. Cook, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant. R. W. Koskinen, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner David Schwartz with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference

and Rule 166(c). The commissioner has done so in an opinion and report filed on December 18, 1970, wherein such facts as are necessary to the opinion are set forth. Plaintiff filed a request for review by the court of the commissioner's opinion and report. Defendant requested that the court adopt the commissioner's recommendation and enter judgment in accordance with his report. The case has been submitted to the court on oral argument of counsel and the briefs of the parties.

With respect to the claim for "Overhead", the court does not find the written stipulation before the Armed Services Board of Contract Appeals to be as clear on its face as the Trial Commissioner indicates, but it accepts the reading given that document by the Board and the Trial Commissioner as the more appropriate and more equitable one in the circumstances.

Since the court otherwise agrees with the opinion, report and recommended conclusion of the Trial Commissioner, it hereby adopts the same, together with the foregoing statement, as the basis for its judgment in this case as hereinafter set forth.[1] Therefore, it is concluded that plaintiff is entitled to recover only to the extent of the $1,215.50 in direct costs agreed upon before the Board and the additional $6,530 allowed by the Board, a total of $7,745.50, not contested by defendant. Plaintiff's motion for summary judgment is granted only to the extent of this $7,745.50, defendant's cross-motion for summary judgment is granted except to the extent of the said $7,745.50 and judgment is entered for plaintiff in the sum of $7,745.50 with plaintiff's petition otherwise dismissed.

## OPINION OF COMMISSIONER

SCHWARTZ, Commissioner: After plaintiff's claim under a Government contract was dismissed by the Armed Services Board of Contract Appeals, on the ground of nonliability of the Government, plaintiff brought suit here for breach of contract, rather than for an equitable adjustment, on the theory that the claim was one for damages for delay which might not have been recoverable administratively even had plaintiff prevailed before the Board. The Government did not object to the theory of the suit. On cross-motions based upon the record before the Board, the court held that the Board had erred—that the Government was liable. Northbridge Electronics, Inc. v. United States, 175 Ct.Cl. 426 (1966). Judgment was entered for plaintiff, with a direction remanding the case to the commissioner for trial of the issue of damages.

Shortly thereafter, the Supreme Court decided United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966), in which it was held that where the court in a Disputes clause proceeding determines that an agency has erred in dismissing a claim on the ground of nonliability of the Government, the proper course is to remand the case to the administrative authorities for a determination of the amount of the equitable adjustment. Thereupon the Government moved in the instant case for such a remand, and without objection by the plaintiff the court granted the motion.

The amount of the equitable adjustment due to plaintiff has now been determined by the Board, and plaintiff returns to this court with a suit in two alternative counts, one for breach of contract and one for review of the administrative decision. The parties have cross-moved for summary judgment.

Plaintiff is of course entitled to challenge the Board's decision as based upon errors of law and as lacking supporting substantial evidence. Such a challenge entails a judicial review of the administrative decision, on the record before the Board, in which the decision is examined, to the extent permitted by the Wunderlich Act, 41 U.S.C. §§ 321,

---

[1]. The concurring opinion of NICHOLS, Judge, follows the opinion of the Trial Commissioner which has been adopted by the court.

322 (1964), to determine whether it is based upon substantial evidence and is free from errors of law, fraud, bad faith and arbitrary action. United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963); Koppers Co. v. United States, 405 F.2d 554, 558–559, 186 Ct.Cl. 142, 147–151 (1968).

■ A claimant does not avoid the limitations on judicial review by bringing a suit for breach of contract, for which the remedy would consist of *de novo* trial of the issues of fact. Where all the claims were redressable before the administrative body by an award of an equitable adjustment, the redescription of the claim as one for breach of contract is a transparent and ineffectual device for escaping the administrative jurisdiction for the fresh forum of a judicial retrial of the issues. United States v. Utah Constr. Co., 384 U.S. 394, 419–420, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); Marley v. United States, 423 F.2d 324, 328–329, 191 Ct.Cl. 205, 213–214 (1970). The record before the Board here shows plaintiff to be engaging in such relabeling.

■ The Board, rightly considering plaintiff's claims to be within its competence, entertained them all and made such awards as it deemed warranted by the evidence. Since the only obstacle to the recovery of all that plaintiff wanted was the Board's disagreement with plaintiff on the weight of the evidence, the "administratively redressable" rule applies with full force, and petitioner is limited to such review of the Board decision as may be had under the Wunderlich Act. The language in this court's earlier opinion upon which plaintiff relies as approving a breach-of-contract theory was written prior to the Supreme Court's decision in United States v. Anthony Grace & Sons, Inc., *supra*. To the extent the opinion seems to condone a breach-of-contract theory, it was withdrawn, after the decision in *Grace*, by the grant of the Government's motion, without objection by plaintiff, to amend the court's judgment sending the case to a commissioner for trial, and to remand the case to the Board for determination of an equitable adjustment.

Accordingly, that portion of the petition which seeks common law breach-of-contract relief states a claim beyond the jurisdiction of the court, and the Government's motion to dismiss should be granted. There remains the count directed to the amount of the equitable adjustment determined by the Board.

The awards were intended to compensate plaintiff for increased costs during a Government-caused delay in the performance of a contract for the manufacture of 230 electronic devices, called interrogator sets, used to distinguish friendly from unfriendly aircraft. After 135 sets had been made and accepted, the Government directed that the remaining sets be "bounce conditioned," that is, prepared for electrical testing by being bounced on a table for a prescribed period, to shake out loose bits of wire and disconnect loose connections. After a protest, plaintiff complied, and filed a claim under the Changes clause for the increased costs incident to the delay caused by the directive. The court in the decision cited above held plaintiff entitled to such costs.

In the further proceedings on remand, the Board held that plaintiff acted promptly in making a protest, when the change order was received on October 5, 1959, and in reducing its direct labor and then shutting down production on October 19; and that the change delayed the completion of the contract for 7 weeks or 1½ months, from October to early December.

The Board found the total amount of the equitable adjustment to which plaintiff was entitled to be $7,745.50—$1,215.50 for agreed direct costs and $6,530 for the increased costs of allocable overhead. These amounts are not contested by the Government. The contested matters are plaintiff's claim, denied by the Board in its entirety, for $7,436.56 for the costs of an alleged decrease in the efficiency of labor during the adjudicated delay, and a claim for more than

$37,000 as costs of overhead, beyond those awarded by the Board

1. *The Claim of a Decrease in Labor Efficiency.* Plaintiff seeks $7,436.56 for a 25-percent loss of efficiency by its workmen assigned to contract tasks during the period of adjudicated delay, when the final assembly line was shut down and work was limited to components and subassemblies. The alleged damages are computed by taking 25 percent of the actual direct labor costs for the period involved and adding agreed percentages for overhead, general and administrative costs and profit.

In its opinion the Board agreed that labor engaged in preparing components may slow down when, as in the circumstances presented, there is no immediate need for the product. Recognizing plaintiff's right to an award on presentation of supporting proof, the Board held, however, that the evidence was persuasive that there was in fact no loss of efficiency. The Board wrote that "comparing the evidence as to the amount of work done with the steadily decreasing weekly direct labor dollars in October and November, and weighing in the testimony of Messrs. Harvey and Bliss, the record does not show a loss of efficiency but to the contrary indicates that there was in fact no loss of efficiency."

Messrs. Harvey and Bliss were, respectively, plaintiff's executive vice-president and officer in charge of operations at the time of the performance of the contract. The opinion notes that they were the men "who saw the work being performed" and thus that "their testimony should be and has been given the evidence on which the Board relied some weight." Little or no weight was actually given. "The principal weakness in their testimony," the Board said, was "its general nature and lack of specific factual information." The Board preferred the evidence of direct labor costs and work performed on the contract during the two months involved, upon which it concluded that no loss of efficiency

had occurred. Among the considerations mentioned were that plaintiff's work on other contracts was at that time increasing and that its workers were being assigned to other contracts.

Plaintiff does not so much criticize as contends that the Board did not give sufficient weight to the testimony of Messrs. Harvey and Bliss. Plaintiff asserts that the evidence relied upon was not substantial in the face of the opposing evidence of the testimony of these witnesses.

Here, then, is another of the many cases where there is evidence to support an administrative decision, and claimant contends that "there is opposing evidence so substantial in character as to detract from its weight and render it less than substantial on the record as a whole." Williams v. United States, 130 Ct.Cl. 435, 441, 127 F.Supp. 617, 619, cert. denied, 349 U.S. 938, 75 S.Ct. 783, 99 L.Ed. 1266 (1955). On such a claim, "[w]here * * * the opposing evidence is *not* overwhelmingly in favor of the opposing view, the view of the facts adopted by the Board, if otherwise proper, will be sustained when supported by the evidence." Koppers Co., Inc. v. United States, *supra*, 405 F.2d at 559, 186 Ct.Cl. at 151; emphasis in original.

■ The testimony was far less than overwhelming. The substantial degree to which the testimony was subjective, general and inspecific may be seen from these excerpts, particularly relied upon by plaintiff:

*Mr. Bliss (stipulated testimony):*

It turned out that we were held up approximately two to two and a half months, not effectively producing, and we lost a great deal of efficiency because the people were concerned about the state of things. Talk spreads like wildfire about layoffs and there was talk about closing down the whole operation because of problems on this contract. We had to keep the contract going for morale even though we had inefficiencies.

*Mr. Harvey:*

Q. Would you describe, with regard to that claim, what inefficiency took place in October, and, if you want, in November.

A. Well, I estimated that the [in] efficiency was perhaps about 33 percent. Other people have had perhaps different figures in mind above and below. My estimate was about a third.

Q. And this would be for what?

A. For the months of October and November.

Q. I see. And how is this estimate based? Are you estimating differently for each month?

A. Well, this is an overall estimate. We knew what went on; we knew the stretch-out; we knew the slowdown, and we knew the fact that the morale was low during this period because people are not going to exert their best efforts if they know that the equipments they are producing are not going to be shipped, they are going to be held up for one reason or another. This is an overall estimate based on experience.

Q. When you say "inefficiency" what do you mean?

A. Well, the people would just take that much longer to do the same amount of work.

Once production was restarted, plaintiff says, it was never able to achieve again the productivity and efficiency of the time prior to the shutdown. This is supported by the following testimony of Mr. Harvey:

A. Well, in the first place, we only had 65 more equipments to manufacture, which under normal circumstances was a month's or a month-and-a-half's production. We couldn't hope to regain any measure of our efficiency with such a small quantity of remaining equipments. It was just imprudent to try to build up any-

where near our rate that we had achieved in September. We did the best we could to get people back on this contractual job who could help us finish it out in as quick a time as possible.

And by this testimony of Mr. Bliss:

The people in final assembly and the testers had been off this job for almost all of November and we had to get them requalified, so to speak, to get back into the routine of doing the job—when we had hit the earlier production peak these units were going through better than one a day—but people had been off this job and we had to do a certain amount of refamiliarizing with the job.

Though the witnesses were testifying to measurable facts, they presented no supporting data. They were testifying to facts which plaintiff knew, at the time it protested the change order and made a claim, it would one day be required to prove. Yet they came to court with nothing but their opinions. In the circumstances, the testimony was little more than a self-serving conclusion.

■ Generalized, conclusory, unsupported opinion testimony does not compel respect or demand weight, at least in the presence of contrary evidence of an objective nature, and it is certainly not the "overwhelming" type of evidence required for a reversal of an administrative finding of fact which has some support in substantial evidence. It is no matter that the testimony was "not contradicted" or that the witnesses were not cross-examined. Sternberger v. United States, 401 F.2d 1012, 1015–1016, 185 Ct.Cl. 528, 533–536 (1968); Electronic and Missile Facilities, Inc. v. United States, 189 Ct.Cl. 237, 251, 416 F.2d 1345, 1354 (1969); Rice v. United States, 192 Ct.Cl. 903, 910, 428 F.2d 1311, 1315 (1970).

2. *The Claim to Overhead.* The Board held (1) that a stipulation of the parties, on the subject of overhead costs on a "space allocation" basis, was inapplicable because it was conditioned on a

finding which could not be made; (2) that a space allocation basis for computing overhead would produce an inequitable result; and (3) that on a direct labor cost basis, allocable overhead for 2 months would be $5,572, and on the fixed overhead basis used by a Government auditor, $5,936. Adopting the larger figure, $5,936, and adding profit at an agreed rate, the Board awarded $6,530.

Plaintiff claims that the Board erred in not applying the stipulation, which, it is said, required an award on a space allocation basis at the rate of $26,274 per month, either for the 1½ months of adjudicated delay or the 2 months used by the Board, plus profit, a total of $44,452 or $57,802, or about $37,000 more than the Board awarded. The issue is the propriety of the rejection by the Board of the stipulation as governing the basis for an award of overhead costs.

The stipulation was reached during a recess in the administrative hearing, and its text was read into the record. In this court, plaintiff made a motion to correct the text of the stipulation; the motion was denied without prejudice to its renewal upon a showing that the court has and should exercise jurisdiction to grant such a motion. Without any attempt to make such a showing, an affidavit is now presented, with the motion for summary judgment, whose intention it is to explain the circumstances of the making of the stipulation and influence its interpretation in this court.

 An affidavit may of course be offered in support of a motion under Rule 101(a) for summary judgment on a cause of action entitled to a normal judicial hearing. Plaintiff's claim of this character, for breach of contract, however, has been held, above, to be beyond the jurisdiction of the court. The only claim properly here is one for a review of the Board's decision under the Wunderlich Act. On such a review the court may not consider evidence other than that presented to the agency and contained in the administrative record. United States v. Carlo Bianchi & Co.,

*supra,* 373 U.S. at 714, 718, 83 S.Ct. 1409. The affidavit will therefore be treated as stricken from the record in the case now under consideration, for review of the Board's decision on the stipulation. Rice v. United States, *supra,* 192 Ct.Cl. at 910, 428 F.2d at 1315. Plaintiff's contentions as to the meaning of the stipulation will be considered only on the basis of the text of the stipulation as it appears in the record.

The relevant portion of the stipulation reads as follows:

> \* \* \* With respect to Item 4(d) of the complaint, where overhead costs \* \* \* are claimed, it is stipulated between the government and the appellant that, if the Board finds appellant spent an additional period in performing the contract as a direct result of the imposition of bounce conditioning, and actually utilized the facilities originally allocated to the performance of the contract for that period, the monthly overhead allocable to those facilities is $26,274.00.

The Board found that the final assembly line was shut down and not actually utilized between October 19 and December 5 and, accordingly, that the period of delay was 7 weeks or 1½ months, enlarged to 2 months for purposes of computing overhead; that "between 19 October and 5 December \* \* \* the facilities allocated to the performance of the contract remained the same," and that during this period plaintiff "did not actually utilize the facilities allocated to the performance of the contract."

Reading the provision in the stipulation that "appellant actually utilized the facilities originally allocated \* \* \* for that period [of delay]" as stating a condition, and having found that during the period of delay the plaintiff "did not actually utilize the facilities allocated to the performance of the contract," the Board held the stipulation inapplicable.

The stipulation, of a kind familiar in litigation of this type, was an agreement to what accountants would otherwise testify to, without objection. It settled

that if certain facilities were found to have been utilized during an adjudicated delay, the allocable overhead costs were a stated amount monthly. No simpler words could have been used to state a precondition that the Board find that the originally allocated facilities were utilized: "if the Board finds appellant * * * *actually utilized* the facilities originally allocated to the performance of the contract for that period." Once the Board concluded that this condition was not fulfilled, the stipulation became irrelevant and was properly put aside.

Plaintiff argues that the stipulation means that the monthly overhead allocable to the facilities is as agreed if there is an adjudicated delay and if the facilities originally allocated continued to be allocated. Under this interpretation, the condition requiring that the facilities be "actually utilized" would be converted to a condition that the facilities be continued to be allocated: "if the Board finds appellant * * * ~~actually utilized~~ *continued to allocate* the facilities originally allocated to the performance of the contract for that period."

This remarkable result is achieved in two steps. Plaintiff first urges that the parties could not have meant that the facilities originally allocated to the performance of the contract be "actually utilized" during the period of delay, because they all knew that the space originally allocated was in fact not utilized during that period. Then, with the words "actually utilized" deleted, plaintiff replaces them with the words "continued to allocate," on the ground that continued allocation is what the parties had in mind. Both steps are unsupported assertions as to what was in the minds of the parties.

■ Even if written agreements could be so easily rewritten, the claimed grounds are incorrect. The parties did *not* know, so certainly as plaintiff asserts, that the originally allocated space had not been utilized during the delay. According to plaintiff's brief, the parties during the hearing believed that the testimony might "reveal details counter to the knowledge of the parties when the stipulation was made" and, also, both parties "knew" that Mr. Bliss, who had not previously testified, "would have more detailed knowledge on the use and allocation of facilities than had previously been placed in the record."

In any event such a bold rewriting as is attempted, substituting for a clear text words of utterly different meaning, is beyond the limits of interpretation. Plaintiff's further suggestion that the desired result may be achieved by "reformation," assuming its validity if supported by evidence, is deprived of basis by the exclusion from consideration of the affidavit mentioned above and the limitation of the cause of action to a review of the administrative action solely on the record before the Board.

■ A subsidiary claim of error by the Board is that it disregarded another stipulation of the parties, which is claimed to have been an agreement that the space allocation basis for determining overhead was the "more equitable." The source of this alleged stipulation is a colloquy among the Board member and both counsel. In the course of the colloquy, plaintiff's counsel referred to the space allocation method as "more equitable," and Government counsel, in answer to an inquiry, agreed that his witness "will not be contesting the space allocation method" but would be testifying on another subject. The entire colloquy is set out in the footnote.[2]

2. MR. WINTER [Board Member]: And your next contention is that, for that reason, there were these additional two months of overhead that should be allocated to this contract in some manner?
MR. BOYD [Counsel for Claimant]: That is correct, and we have stipulated.

MR. WINTER: And you can't do it in the original manner, which I think was direct-labor and direct-materials manner; so you have another manner of doing it, and I believe I heard "space utilization."
MR. BOYD: Allocation of plant area. This was the largest single contract in the

Neither of the comments was marked by any formality or other indication that they were intended as stipulations. The statement by plaintiff's counsel was an expression of his own approval of the space allocation method. The remark of Government counsel was a description of testimony to be given; it was neither an agreement beyond the stipulation already reached nor a construction of that stipulation. A binding stipulation cannot be put together from casual conversation with a presiding officer, without thought of agreement to a matter in dispute.

No stipulation, therefore, limited the Board in rejecting the claim of the appropriateness of the space allocation method for computing overhead. In rejecting that method, the Board acted unobjectionably, on findings that if used the method would result in distorted, inequitable findings as to allocable overhead. The distortion of such a finding is apparent from the gross disparity between the $8,652 claimed as direct costs ($1,215.50 agreed upon and $7,436.56 claimed for reduced inefficiency) and the $44,000 to $57,000 in allocable overhead produced by the space allocation method.

## CONCLUSION

For the reasons stated, plaintiff is entitled to recover only to the extent of the $1,215.50 in direct costs agreed upon before the Board and the additional $6,530 allowed by the Board, a total of $7,745.50, not contested by defendant. Therefore, plaintiff's motion for summary judgment is granted only to the extent of the said $7,745.50, defendant's cross-motion for summary judgment is granted except to the extent of the said $7,745.50, and judgment is entered for plaintiff in the sum of the $7,745.50 with plaintiff's petition otherwise dismissed.

NICHOLS, Judge, (concurring):

With all respect I think Commissioner Schwartz rewrites the stipulation too. He says plaintiff wants to make it read "continued to allocate" instead of "actually utilized" as it says. He makes it read "fully utilized," which is not the exact language either. The parties, of course, knew that the facilities could not have been fully utilized during the delay period because if they had been there would have been no claim. So the stipulation is read as to be triggered only by a state of facts the parties knew to be impossible. If contractor reserved the involved facilities during the delay period and until completion, for the contract and not anything else, and if he utilized them to the extent the delay allowed him to, he "actually utilized" them, I say. If I might have driven my car 10,000 miles in May, but actually drove it only 1,000, so it was idle in the garage most of the time, I did not "actually utilize" it that month according to the Board's and Commissioner Schwartz's semantics, with which I do not agree.

The Board analyzed the overhead problem most carefully and I agree with it that the stipulation overhead is an excessive allowance, or at least, substantial evidence supports its position. There is nothing in the United States Constitution or the natural law that requires an administrative tribunal to honor a stipulation it can plainly see to be contrary to the facts. *Cf.* H. B. Zachry Co. v. Unit-

---

plant, and we have stipulated here that it took 44.7 percent of the plant area. The government, I assume, will have some questions about that with regard to particular months, but it is agreed that it did during the normal course of the contract take this 44.7 percent of the plant area, and this basis of allocation was utilized as the more equitable basis of allocating overhead under a situation where you have a reduced work force,

MR. WINTER: And, Colonel Hubbard, when I listen to your witnesses, they will not be contesting the space allocation method? Rather, contesting the need for any stretch-out at all? Is that right?

COLONEL HUBBARD: Yes, and space allocation insofar as the utilization of a bounce conditioning may be questioned.

ed States, 170 Ct.Cl. 115, 344 F.2d 352 (1965). In this court, at least, the cited case would suggest that counsel could have had the stipulation reformed or expunged. It does not seem to me that giving it an unnatural interpretation is the best or even an acceptable way of resolving the problem it poses.

It would no doubt be foolish to return the case to the Board to correct a procedural error of this kind and I do not so suggest.